Jefferson v. Sewon America. Okay, Ms. Farahani, you come first. May it please the Court. My name is Amanda Farahani, and I am here on behalf of Jerberee Jefferson. I appear with Philip Kavnat. My apologies. It's okay. I've had my problems before, too. And most usually with my own name. So, on behalf of the EEOC, I am here because my client was denied the right to a jury trial. Right. The facts in this case are so— I'll tell you from my own perspective where I think you would spend your time more productively. I mean, I think that one of these provisions is a disparate impact provision. I think this is a disparate treatment case. I also think that the constitutionality of summary judgment in Title VII cases is really not a productive area for us this morning. But I think you may very well be entitled to a reversal here. I'm wondering why it is, though, that the evidence that the decision-maker said, I want a Korean in this position, is not direct evidence. And you don't even argue that. It seems to me that that could have been part of the confusion for the district court, is that you didn't characterize that as direct evidence. Maybe there's a reason for that, and maybe it's not. But it struck me as maybe it is. Well, Your Honor, I would think it's direct evidence as well. But you haven't said that. You haven't argued that. Why? Because the courts have held that in order for it to be direct evidence, it must be that it comes from the mouth of the decision-maker. I thought this was the decision-maker that supposedly said that. Well, no. It was actually coming from an intermediary who said the decision-maker said that. And so at that point, we have removed it from direct evidence. But I would point out, Your Honor, that the— Well, if it comes in, it comes in because it's a statement of the decision-maker related by another member of management, right? Correct. So if it's not hearsay, it's admissible, right? Yes. It's still the statement of the decision-maker, isn't it? It is, Your Honor. Okay. Yes, Your Honor. And I think one of the issues that is before the courts now is the idea that there is a difference between evidence in summary judgment cases, the idea that there is a parsing between direct evidence and circumstantial evidence or that we must meet some sort of rigid test in which to prove that discrimination occurred. I think this case is a simple case. And in this case, we have that C1 America told Ms. Jefferson that she was not getting the IT position because she was not Korean and because they wanted to put a Korean in that position. She complained about that, and one week later, she was fired. That this case was dismissed at summary judgment shows how far we have come from the broad remedial intent and the plain statutory language of Title VII that states an employer shall not discriminate because of race. Before you today are three issues, Your Honors. The first one is did the lower court err in granting summary judgment in this case? The second is does the application of Title VII, the second provision, A2, allow for disparate treatment cases such that no adverse action is required? And then third, which I will touch on, Your Honors, with your indulgences, that does the practice of summary judgment, at least as how it's been applied, violate the Seventh Amendment right to a jury trial? First, finding that the lower court erred here should be simple. There can be no doubt that Congress intended to protect against the type of conduct that occurred here. This court has already held in Wideman v. Wal-Mart that exactly this type of conduct, where there was a refusing to fill a position because of race, was not only illegal under Title VII, but was also the basis for a reasonable good-faith belief. Additionally, in Brungardt v. Belsall, this court has held- Your colleague is going to deal with retaliation. You're not going to talk about that at all, then? Yes, Your Honor. I can answer questions on it. He's dealing primarily with the good-faith issue, but I can answer questions as to pretext on that, as can he. Speaking for myself, you have a very good argument, I think, in the sense of the promotion opportunity. And I gather your position, and we'll hear from your opponent, is that here the transfer, even though the benefits were somewhat similar, this was still a higher-quality job. Absolutely, Your Honor. And she does not get that job, and let's assume that you have a viable claim that should survive summary judgment, that there were discriminatory reasons that she does not get that. I think the retaliation question, though, is a much closer one and a much more difficult one for you, speaking for myself. And that is that with these evaluations that were done for her by two women who knew nothing about the Korean comment and knew nothing about anything that was going on with that, and it was that which doomed her, it was that which caused her to get fired, these bad evaluations. How do you – why was the district court not correct to grant summary judgment on the retaliation claim? Well, Your Honor, that those were the reasons is in fact itself evidence of pretext. So to start with, those 90-day reviews didn't even occur until – were not meant to occur until after the 90-day period had expired. So the first set of reviews that occurred happened after 90 days expired. The second set of reviews occurred one month before the 90 days expired. It was started by Mr. Horton, who in fact was the one who had received the complaint of discrimination, who provided that. You're saying the timing that he requested an evaluation early in itself suggests something is amiss. Yes, Your Honors. In addition to that, that she failed these evaluations is not clear at all. A jury could reasonably find that. This idea that there was some magic number in which to cut off the plaintiff is unclear. There's been – Well, didn't Mr. Horton testify that anybody who had ever gotten a score this low would have not – would have – she's probationary. She's not a full-time real employee that that person would have and had in the past been let go? Yes, Your Honor, but there's no evidence that that in fact was true. There was multiple different numbers, and so the number was at 1.135, and then it was 32.5, and it was 34 and 35. So there's no consistency to what that number was as to whether or not there even in fact was anything. Instead, what a jury could find is that this was used as a pretext to cover up the fact that they wanted to dismiss her because of her complaint of discrimination, and it is the jury that should be making that decision. Kim testified she had never filled out this type of evaluation for anyone else or reprimanded anyone else for the same kinds of conduct issues in her evaluation of Jefferson, right? Correct, Your Honor. And Jefferson – she had also testified that Jefferson was performing her job duties well. Correct. On the same day she completed the negative evaluation. Correct. And Mr. Horton said that they wanted to terminate her, whereas they said they did not want to terminate her. Yes. Your Honors, I want to turn to – Can I ask you a question? Please do. This is not directly what you're talking about, but it's something I wanted to understand. This five-year experience requirement on the job, I couldn't tell. Is that written down anywhere? No, Your Honor. Or where did that come from? That came after she had been already offered the job, told she was going to start, and in response to what Mr. Jung, the HR person, had said. Not only was it not written down anywhere, it was not in any job postings that they had provided. Nobody else ever had a five-year experience. And so this was an after-the-fact justification in order to take away the rights. I believe my time is up. Yes, Mr. Covenant. You've saved three minutes for rebuttal, Ms. Farahani. Good morning, Your Honors. May it please the Court. My name is Philip Covenant. I'm with the EEOC. And I'd like to just jump right in on the retaliation claim, and really the focus of our brief is whether the district court erred in finding that Ms. Jefferson did not engage in protected opposition activity under the anti-retaliation provision under Title VII. The critical point to make at the outset about that is that to establish protected activity, Ms. Jefferson does not need to establish that the denial of the transfer was itself a violation of her rights under Title VII. She just has to establish that her complaint was motivated by a reasonable belief that it was a violation of Title VII. And a classic example, as Judge Pryor indicated, of employment discrimination is when an employer denies an opportunity to an employee and tells her she is being denied that opportunity because she is not of a certain national origin. And that's what occurred in this case. Gene Chung told Ms. Jefferson, after reviewing her resume and indicating that she might be in the running for the job, he told her that she could start the job the following week, but then rescinded that opportunity and told her that she could not have the job because she was not Korean. And so when she complained about that to Ken Horton, the human resources manager, that constituted protected opposition activity under Title VII. The district court found otherwise for two reasons. Instead of focusing on this direct statement of discriminatory intent, the district court focused on whether the transfer or the denial of the transfer was an adverse employment action under Title VII and on whether Ms. Jefferson was qualified for the IT tech job. But taking whether or not the denial was an adverse employment action, that really asked the wrong question because it is not whether that denial is, in fact, an adverse employment action. It's simply whether she had a reasonable belief that it was. And a jury could easily agree with Ms. Jefferson that going from a entry level clerical position in the finance department to an IT tech position, which she had described as her career goal, which required her to study classes, and which Siwon now says required five years of experience to possess, I mean that in and of itself establishes that it is a superior job under Title VII. If I understand your position, your position is even if it turned out that maybe she suffered no real harm because she wasn't going to get the job anyway, that it was proper to fire her for these evaluations, she still was engaging in protective conduct. She says that she had been told she wasn't hired because she was a Korean, and whatever the outcome later on might have been, she was engaging in protective conduct to complain about that. And your argument is the district court was wrong to say otherwise. That's correct, Your Honor. And the focal point of the analysis is what information Ms. Jefferson had at the time that she made the complaint. And she was well within reason in believing that she was being denied this opportunity, at least in part based on the fact that she was not Korean. And that is sufficient to give rise to a reasonable belief and therefore establish protected activity. The other issue with respect to qualifications that the district court focused on, it's our view that qualifications are irrelevant in a case like this where there is direct statements from one of the decision makers that at least part of the reason the person is being denied the job is some prohibited characteristics such as race or national origin. So we disagree that that should have even been addressed in the protected activity part of the analysis. I think I will turn to the pretext portion of our brief because I think Judge Carnes indicated some concerns there. The critical point here is that C1 says that the reason it fired Ms. Jefferson is she failed to reach this minimum score on her evaluations. But a jury could find pretext for various reasons. First of all, she was fired just seven days after lodging this complaint, and that close temporal proximity can support a finding of pretext. And the problem is the women that filled out these evaluations knew nothing about the complaint. That's correct, but just building on what Ms. Farahani said, Mr. Horton was the one who received the complaint, and he was the one who made the final decision to terminate. He says that he was basing it on this supposedly predetermined score, but C1 has been completely inconsistent with respect to what this supposedly predetermined score was. As she mentioned, as Ms. Farahani mentioned, initially it was a 135. Then C1's attorneys represented to the EEOC it was a 34. Now they say it was a 35. The district court said it didn't matter because she didn't have any of those scores, but that's not really the point. The point is that they've been so inconsistent that a jury could find that this is a cover-up for what was really retaliatory motive. And there was one portion of Ms. Kim's evaluation which indicated she was giving a lesser score because Ms. Jefferson had gone to HR to complain. It's not clear whether she was referencing this specific complaint about the – I see my time is up. May I just finish this sentence? It's not clear exactly what she meant by that, but a jury could read into that that at least part of the score she was receiving was based on her complaint to Mr. Horton. I thought it was – I can't remember the other complaint, but I thought it was some other trivial. I mean, these two supervisors were clearly very exacting bosses, no question about that. Right. And I think Mr. Horton is the main focus for the pretext analysis and the ultimate retaliatory motive. Thank you, Your Honors. Thank you. Mr. Gumbel. May I please record good morning, Your Honors? Good morning. John Gumbel on behalf of SAE 1. I can start at any one of these directions, but I'm going to start with the retaliatory discharge claim and move to the causation element because I think things are sort of misunderstood at this point in time. The – Ms. Jefferson had – there is no competent proof that there was a causal effect between the protected activity and the adverse employment action of discharge. What we have is a lot of speculation on behalf of Ms. Jefferson and her counsel. What happened and what the uncontradicted record evidence – Timing sure is close. Pardon me? The timing sure is close. The timing is close, and there's a reason for that, and I'll address it. The timing is close because as Ms. Jefferson admitted in her deposition, there was a policy in place that said introductory employees will be evaluated. It doesn't provide a precise time near the end of their – and I'm paraphrasing – near the end of their probationary period. The timing is close because she was evaluated by her supervisors three weeks before the end of her probationary period. At the same time, she was going around her finance department supervisors to IT trying to get this other position without telling them that she was doing so. So the timing was natural based on both the policy for the evaluations, and there's no record evidence anywhere showing that these evaluations were performed either before or after the norm of probationary employees at the time. So the evidence shows this. The evidence shows – Where do the numbers come from? The numbers were – There's lots of numbers, but where are they written down? The record shows that the numbers were pre-established by the HR department that when the supervisors scored – I don't know if they're written down anywhere – Was Mr. Horton just deciding what the numbers are? No. The record evidence shows that they were established for every introductory employee, and there is no evidence that shows those same numbers weren't applied to every other introductory employee. If you had a standard or numbers, surely they'd be written down on a piece of paper somewhere, right? Not necessarily. There's a lot of employment policies that aren't written down on pieces of paper. Yeah, but these are very specific numbers, although they changed, right? You say in your brief there was an error. I don't understand what the error was. How can you be applying these very specific numbers and then say you didn't pass or you did pass without there being a standard that you're judging it against? Well, it's a fairly simple process. If the threshold score is 35, then you take the numbers assigned by the supervisors for the performance evaluation, add them together, average it out, divide it by four, I believe, and there's all sorts of explanation. The record for how this happened, and then that comes up either above or below that 35 number. And I guess my question to you is where is 35 written down? It's not written down that I know of. There's no record evidence of it being written down, but there's no record evidence of it being applied any differently to any other employee, any other introductory employee. So what we have are two supervisors in the finance department who evaluate Ms. Jefferson. Well, here's the question. Your opposing counsel says normally one would expect you'd get the whole 90-day period. She'd have 30 more days to get better. This is 60 days. What does the record say as to what prompted them to evaluate her at this particular time? There's no record evidence other than the supervisors knew that the end of her probationary period was coming up. She did have some recent performance problems, which she admitted to, that there's no record evidence and there's no – this falls under the super personnel series of cases, I believe. And Title VII doesn't dictate, you know, when you perform the evaluation. It just requires the appellant to prove that we somehow discriminated against her in applying it earlier or later. I guess what they're trying to suggest, and maybe this is your speculation argument, they're trying to suggest that somebody got to these two women, Horton or someone else, and said, could you go ahead and do your evaluation early? And there's no evidence of that. There's no evidence of that. And did either of them testify why they decided at this point to do the evaluation? They weren't asked the question, I don't believe. If they did, my memory, and I'm going from memory, is that they testified that they knew the end of the evaluation period was coming up and they did it in anticipation. But the record evidence does show that these supervisors were not in any way influenced by Mr. Horton. They did not know, as Your Honor mentioned, they did not know anything about this alleged complaint that was denied by the company about wanting a Korean in that IT position. What about the progressive discipline policy? Failure to follow that? The policy of SAEWON says that they will evaluate introductory employees and that they can be discharged at any time for any reason. Also, the SAEWON progressive disciplinary policy contains the typical language that says we may or may not follow this. So with introductory employees, they didn't necessarily follow progressive discipline because it's a 90-day period, and if you're going to give warning after warning after warning, it doesn't make sense. The whole purpose of an introductory policy such as that is to make sure everybody is aware. During that time, they're under maybe a little closer scrutiny than they normally would be. What about Kim's testimony that she was performing the job well on the same day she gave her a negative evaluation? I believe that testimony is that she was performing in certain areas, like her substantive functions were fine. Her problems that she admitted in her deposition were that she would show up to work late, she would take long lunches, she was counseled regarding using her cell phone in the finance department. She went around, and there's very little doubt here that her going around the finance department sort of trying to get this IT job without telling them that she was planning on leaving did not help her employment chances. They were apparently highly offended by her doing that. Yes, I think they were. May I get a drink of water? Yes. To just follow up on the evidence regarding Can I ask you the same question I asked your opponent? Sure. One of the reasons cited originally, at least if you look at the evidence, it was favorable to the plaintiff, which is one of the reasons that was given for her being told she could have the job and then being told she couldn't have the job was that she didn't meet a five-year experience requirement. Correct. I'm going to ask you the same question. Where is that written down? Where did that policy come from? I don't know that that policy is written down. There's no record of it being written down anywhere. It was the company's decision that they needed somebody in that IT position with five years of experience. I will say that the evidence Your opponent says the job postings for those positions did not say you needed five years of experience. Is that so? There's no competent evidence of that. What Ms. Jefferson's counsel proposes is that she submitted a LinkedIn profile of the incumbent that doesn't show that he had five years. I understand that and that's probably not good enough. But I thought I read that there were job postings for these positions that did not contain that requirement. There's nothing in the record. There's no record evidence showing that those postings were for that job. Okay. The five-year requirement Not the same kind of job. Pardon me? They weren't for the same kind of job? No, there weren't that many folks in the IT department. There was only one opening and there's no evidence anywhere connecting these so-called dots showing that that particular job was filled by this particular person. My opponent also argues Well, let me ask you about that. Because you say that the position ended up being filled by an African-American male. Correct. But as I looked at the timing, the timing involving the plaintiff was in 2013, August. The position, if I read your brief right, was filled by the African-American male in May of 2014. So almost another year later, is that right? It was quite a few months. I don't remember. It was almost a year. But that's not unusual for a position to go vacant while they're looking for a qualified person to fill the position. Well, that is of interest. Because, obviously, if it was clear that the position was filled with an African-American, no matter what people say about Koreans, she didn't have an adverse action because somebody of her same racial group filled the position. That's an important question. I thought there was some evidence that there were two other positions in addition to the one filled by the African-American that was filled by Koreans. No, there's no competent evidence that those positions were filled at that particular point in time. I believe the evidence is Your position is that position she applied for was lying vacant for a year and the person who then ultimately filled it was an African-American? Correct. I thought that person, that was a contract position, which is really not the same as the job she was applying for. It was a contract position. The company decided to hire the most qualified contract person because they couldn't find anybody non-contract to fill that position. Now, to your point, Judge Carnes, there is a citation, I think, in the brief by opposing counsel that says two Korean individuals filled that job in the interim. One's name was Sim, I believe, and one Choi. Is this Kim's testimony? Yes. Kim testified since Jefferson left, two hires to IT were Korean. Correct. That's the testimony. How does Kim know that? Excuse me, I'm sorry, Judge Carnes. That citation to that record is incorrect. When you go back and look at that deposition, Ms. Kim was asked the question of who is currently employed in the IT department. That was two years after Ms. Jefferson applied for the job and she cited to those two folks. Nowhere does it show that those two folks filled the position that Ms. Jefferson was seeking. What about Dye's affidavit insofar as there's a portion that the magistrate judge, it appeared, left intact that said Saewon wanted and eventually hired a Korean male for the position? I may be mistaken, but I thought the magistrate just ruled that all other issues besides the retaliatory discharge were immaterial and he did not address them. Well, that seemed to be evidence that had not been excluded as part of that affidavit that would support a finding that, in fact, a Korean was hired for the position. It would create a genuine issue of fact. Like all portions of Mr. Dye's or most portions of Mr. Dye's affidavit, nowhere does he describe how he has personal knowledge of that, who the person was, what job they filled. He provides no detail. It's just a generalized statement. Was he deposed? No, he was not. I mean, it's a little bit unusual to have a former employee who was in HR give an affidavit for the plaintiff in an employment discrimination case. And I understood he left on good terms, so it wasn't that, right? So, but you didn't depose him. So whatever he said in his affidavit, it just, and I grant you, it kind of says a lot of different things. Some of it helps you. Some of it helps them. But all we know about Mr. Dye is what we know in the affidavit. Well, I would think that an HR specialist might, in fact, know who was hired for a position. Well, there are very different varieties and different duties for HR specialists. Mr. Dye was not associated with making termination decisions or really anything to do with Ms. Jefferson until the unemployment hearing took place. Now, Now, my guess was you probably didn't anticipate this because he testified for the company at the unemployment hearing and said the reason she was fired, I believe, was because she didn't, her evaluation was bad or something. So you all, I guess, didn't suspect that he was going to come out with this affidavit Well, and I'll address the question. The affidavit was handed to us on the very last day of discovery, and, of course, we had a choice at that point in time. We could have moved for an extension and so forth, but because of the expense of the case and so forth, I reviewed the affidavit. I saw that there was no basis of personal knowledge, that he was making generalized comments, and we felt comfortable that, as the magistrate did, that the affidavit would not be considered competent evidence. Let's assume that Mr. Dye's affidavit is not going to carry any water here today. Your best evidence, then, for the fact that an African-American filled the spot is what? There's testimony that certainly an African-American was hired a year later. What is your evidence to indicate that that position for which he was hired was the one for which the plaintiff was not given the job? The testimony of Mr. Horton in his 30B6 deposition. And he says? Yes. And he says that an African-American contract employee was hired to fill that job several months later. I don't remember the exact dates. The two… And why is it, Kim's testimony, that two individuals hired at IT were Korean and Dye's portion of the affidavit that a Korean was hired for that position? Why isn't that enough to create a genuine issue? Ms. Kim's testimony is not that two Koreans were hired to fill that position. She was identifying the two Korean employees in the ID department two years after all of this occurred. We know that according to this 30B6 testimony, though, that it's a much later hiring, right? That you're saying we're to believe that it was for that position. But we have an affidavit from an HR specialist that says it was a Korean for the position, plus we have testimony from someone who says that there were two Koreans hired in the IT department. Why isn't that enough to create an issue? The affidavit by Mr. Dye is not based on… Nowhere in the affidavit does he state he had any personal knowledge, nor does he identify the Korean, nor does he even identify the job. In fact, Ms. Jefferson herself never identifies the particular job she was applying for, or distinguishes it from any other job in IT. The burden is on Ms. Jefferson here. Well, how many jobs were open in IT at the time she applied? Just that, but there were other job openings after that, and that is my point when I talk about the identity of the folks in the IT department at the time of the deposition are different than they were at that time. Okay. Ms. Farahani. Thank you. Could you help us out on this, whether, as I said before, no matter whatever comment was made about Koreans, if actually the next day they pick somebody that's African American, we don't have an adverse action at that point because somebody in her group got the job. So what is the evidence as to who filled this position? Well, Your Honor, there is a lot of evidence that there was both from Ms. Kim, who said that no one else but Koreans have ever been in this position. I don't care about all that. I want to know there's a job, there's an open job, there's a vacancy. Who got that job and what was their race? Korean. And who was that person? We don't know the names of that individual, Your Honor. Didn't you in discovery try to find out exactly who was working there and their ethnicity and who got what job when? Well, we did actually ask who was replaced, and Mr. Dye told us that it was replaced by a Korean and Ms. Kim told us that it was replaced by a Korean, and that was sufficient for us. We did not need to know the names. And the 30B6 deposition, that would seem to me to be an apt question to ask Mr. Horton. We did, and Mr. Horton had a fact that disputed what Mr. Dye and Ms. Kim said, which is why it's a reason that the jury should make a decision about whether or not a replacement was made. And, Your Honors, I would say that— Let me see if I can straighten some things out, though, Ms. Farahani, and see if we have some agreement about this, and that is your client didn't get the job, right? Correct. That's the adverse action. Correct. Denied the job. Correct. Period. Period. And was given the job and had it taken away. Now, you can look at this in one of a couple of ways. One would be there might be direct evidence that the reason was because she wasn't Korean. Correct. Right? We've heard that there might be that here. Yes. Another would be a circumstantial case. You can use, for example, the McDonnell-Douglas framework, in which case if you used McDonnell-Douglas, that's one way of doing a circumstantial case, you would show that someone of your race actually got the job, right? Correct. That's the way that becomes relevant. You don't have to prove, though, in a direct evidence case that someone of a different race got the job. That is correct, Your Honor. Thank you. And, Your Honors, I want to turn to A2. As Your Honor said, that you believe that it's a disparate impact case. We have done the research. We have not found a single case— I apologize. I want to ask you one more. Yes. Is the record that the African-American male who was hired, was he hired in May of 2014, like nine or ten months later? Or is there—what's your understanding of the record? The 30B6 witness did testify to that, but, of course, that is an interested witness and under review should not be considered or cannot be considered. Under A2, Your Honor, the inclusive communities, and Justice Kennedy and Justice Thomas both agreed, that under A2 that the second provision is a disparate treatment claim. And not only has the Supreme Court agreed with that, but the Seventh Circuit recently has addressed it in a disparate treatment claim, which was in the EEOC versus AutoZone case. There is absolutely no case law that says that the disparate treatment— that A2 is not a disparate treatment provision, nor has the defendant pointed to any law that says so. Well, we may see that law coming. Thank you, Ms. Farahani. Thank you, Your Honor. We have your case and we'll be in recess until tomorrow. Thank you.